IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA L. FERREE, | ) |
|         Plaintiff, | ) |
| vs. | ) Civil No. 13-cv-1113-JPG-CJP |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
|         Defendant. | ) |

## **MEMORANDUM AND ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff Lisa L. Ferree is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

### **Procedural History**

Plaintiff applied for benefits on October 5, 2010, alleging disability beginning on November 21, 2009. The alleged onset date was the day after her prior application for benefits was denied. (Tr. 17). After holding an evidentiary hearing, ALJ Jonathan Stanley denied the application for benefits in a decision dated May 10, 2012. (Tr. 17-29). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### **Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ did not properly evaluate the medical evidence in forming plaintiff's mental RFC.

2. The ALJ erred in making his credibility determination.

**<u>Applicable Legal Standards</u>**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

>past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus,

this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Stanley followed the five-step framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the date of her application. He found that plaintiff had severe impairments of degenerative disc disease of the cervical and lumbar spine, status post two cervical fusion surgeries, obesity, major depressive disorder, bipolar disorder, posttraumatic stress disorder, borderline personality disorder, and histrionic personality disorder.

The ALJ found plaintiff had the residual functional capacity to perform work at the light level, with physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work. However, she was not disabled

because she was able to do other work that exists in significant numbers in the regional and national economies.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Report and Recommendation. The following summary of the record is directed to the points raised by plaintiff, which all relate to limitations arising from her mental condition. Therefore, the Court will omit substantial discussion of evidence related only to her physical conditions.

**1. Denial of Prior Application**

Plaintiff filed a prior application for benefits on October 11, 2007. Plaintiff had a herniated disc from a work related injury. After conservative treatment was unsuccessful she had fusion surgery in 2006. Additionally, plaintiff had major depression, post-traumatic stress disorder, and a history of marijuana abuse. The application was denied on November 20. 2009. (Tr. 126-38).

**2. Agency Forms**

Plaintiff was born in December, 1964 and was 44 years-old on the alleged onset date. (Tr. 225-26). She was insured for DIB through March 31, 2011.[2] (Tr. 226). She had an associate degree in secretarial studies with word processing. (Tr. 231).

In addition to her physical conditions, plaintiff said she suffered from major depressive disorder, bipolar disorder, posttraumatic stress disorder, histrionic personality disorder, and borderline personality disorder. (Tr. 230).

Plaintiff previously worked as an accounting manager, accounts receivable clerk and manager, front desk clerk, and a machine operator. (Tr. 231).

---

[2] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

In a Function Report submitted in November, 2010, plaintiff stated she suffered from depression, anxiety, and posttraumatic stress disorder since she was a child. (Tr. 252). She had trouble getting along with her daughters and their husbands so she tried to stay away. Plaintiff had one friend that she spoke to and that helped her with some tasks. (Tr. 255). She felt she was always making someone mad or doing the wrong thing. She said she had trouble with her memory, completing tasks, concentration, understanding, following instructions, talking, and getting along with others. (Tr. 256). She did not do well with following directions or listening to authority figures and was once fired for shoving a manager. (Tr. 257). Plaintiff stated she had contemplated suicide since the age of six. (Tr. 266).

3. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on May 2, 2012. (Tr. 43).

Plaintiff stated she was 47 years-old, was 5'5", and weighed 220 pounds. (Tr. 45). She lived alone and her home did not have water. She received food stamps and had no other source of income. (Tr. 46). Plaintiff last worked as a machine operator where she was injured and stopped working in 2005. She received worker's compensation from 2005 through 2007 when her claim was settled. (Tr. 48). She had a driver's license and drove herself to the hearing. (Tr. 46-47). She only drove once a week to go to therapy or get groceries. (Tr. 59).

In 2009 plaintiff began having weekly therapy sessions for her psychological conditions at Human Resources Center. She had several therapists and had multiple mental status examinations throughout her years at Human Resources. She was treated for bipolar disorder, depression, anxiety, borderline personality disorder, and stress problems. (Tr. 58). Her bipolar disorder caused her to be primarily depressed with periods of mania. (Tr. 58-59). She testified

that her depression made it hard for her to accomplish anything except letting her dogs outside a few times a day. (Tr. 59).

Plaintiff's primary care physician, Dr. Pine-Mattas, prescribed her medications for her psychological conditions. Dr. Pine-Mattas worked in conjunction with her therapist. (Tr. 60). Plaintiff felt the psychiatrist at Human Resource Center did not like her so she relied primarily on Dr. Pine-Mattas for medications. (Tr. 60-61). At the time of the hearing plaintiff was taking Seroquel, Xanax, Celexa, Skelaxin, and Vicodin. She did not feel the medications significantly helped her depression but they did help her sleep. (Tr. 61).

Plaintiff was easily angered and had no friends. She only spoke to her therapist, her brother-in-law, and his wife. She had no real interests outside of watching television and occasionally seeing her daughters. (Tr. 63). Plaintiff stated her posttraumatic stress disorder affected her every day. (Tr. 65). She had attempted suicide in the past and had suicidal thoughts daily. (Tr. 66).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do light work, limited to lifting and carrying twenty pounds occasionally, ten pounds frequently, and standing, walking, or sitting for six hours out of an eight hour workday. She could frequently climb stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes and scaffolds. Additionally, she could understand, remember, and carry out short, simple instructions, make simple work-related judgments, interact occasionally with supervisors and coworkers, only have superficial contact with the general public, and manage and tolerate occasional changes in the workplace setting. (Tr. 77-78).

The VE testified that the person could not perform any of plaintiff's previous work. However, the person could do jobs that exist in significant numbers in the national economy. Examples of such jobs are inspector, encapsulator, and electronics worker. (Tr. 78).

**4. Mental Health Records**

Plaintiff regularly saw her primary care physician, Dr. Denise Pine-Mattas from 2006 through 2011. Dr. Pine-Mattas recorded plaintiff had a history of anxiety, depression, family stress, and borderline personality disorder. (Tr. 715). Dr. Pine-Mattas prescribed and regularly refilled plaintiff's prescriptions of Doxepin, Albuterol, Xanax, Celexa, Flexeril, and Seroquel. (Tr. 717). In April 2009, plaintiff was reportedly trying to see get in to see a psychiatrist and was seeing a therapist once a week. (Tr. 716).

Plaintiff saw Dr. Pine-Mattas several times in the next few years. At each appointment, Dr. Pine-Mattas noted plaintiff's mental impairments had either deteriorated or were unchanged. (E.g., Tr. 591, 862, 867). Plaintiff reported her moods being "up and down" and continuing stress. (Tr. 585). At the last visit on record in December, 2011, plaintiff had no significant changes and was reportedly depressed, anxious, and had flat affect. (Tr. 862).

Dr. Pine-Mattas filled out a mental RFC questionnaire for plaintiff in September, 2011. (Tr. 840-44). She reported plaintiff having posttraumatic stress disorder, bipolar disorder, histrionic disorder, borderline personality disorder, financial and legal troubles, and a GAF score of 54. Her prognosis for plaintiff was "poor."(Tr. 840). She opined plaintiff had difficulty thinking or concentrating, mood disturbance, impairment in impulse control, intense and unstable interpersonal relationships and impulsive and damaging behavior, and generalized persistent anxiety, among others. (Tr. 841). She stated plaintiff was seriously limited, but not precluded, in all areas. (Tr. 842-43).

Plaintiff received therapy and mental health assessments from Human Resources Center from 2008 through 2012. At her hearing she stated she had several therapists while receiving treatment from Human Resources Center, but the therapist that performed most of her psychiatric evaluations was Marilyn Talbott.

Ms. Talbott reported plaintiff had occasional suicidal thoughts and had attempted suicide in 1996 and 2008. (E.g., Tr. 464, 469, 478). Plaintiff reported she was living in her garage due to black mold in her trailer and had no heat or running water. (Tr. 458, 474). She needed her friends and family for help with her basic needs. (Tr. 458, 474, 489). When her depression was bad she neglected cleanliness and did not bathe or clean her house. (Tr. 467).  She only showered once a week when she went to someone else's house. (Tr. 469).

Plaintiff's speech was loud and excessive and she had a history of anger issues. (478-79). She had trouble getting along with others and only had one friend, Kathy, who she reportedly fought with frequently. (Tr. 469, 496). Plaintiff was referred to see a psychiatrist twice but after she "called the clinical director in a fit of anger, her name was removed from the waiting list." Ms. Talbott reported plaintiff would have to go to an outside psychiatrist but she had no money for the fees. (Tr. 469).

Ms. Talbott diagnosed her with major depressive disorder, posttraumatic stress disorder, alcohol abuse, histrionic personality disorder, borderline personality disorder, and her GAF score ranged from 45 to 53.  (Tr. 467, 482, 498, 794). In 2012, plaintiff was discharged form Human Resources Center because she had "not achieved/made significant progress toward goals but has either reached [her] anticipated length of stay and/or is not expected to benefit from further outpatient therapy." (Tr. 860). She refused to participate in group therapy and would not engage in her homework assignments. Plaintiff had made minimal progress (Tr. 861).

### 5. Consultative Examination

Jerry Boyd, Ph.D., performed a psychological consultation in December, 2010. Plaintiff was alert and responsive to questioning. (Tr. 537-38). Her attention, concentration, and short-term memory showed mild impairments. Her intelligence was within the normal range but her judgment and maturity were slightly below age level. (Tr. 538). She reported being "sad and grouchy" most of the time. She felt she could not handle stressful situations and was anxious or agitated frequently.

Dr. Boyd's diagnosis was dysthymic disorder with agitation, alcohol abuse in remission, chronic posttraumatic stress disorder, borderline personality disorder, moderate to severe health, pain and finance problems, and a GAF score of 55. (Tr. 539). Dr. Boyd found plaintiff to have reduced stress tolerance, emotional instability, and reduced persistence related to the chronic pain, personality disorder, and depressive symptoms. He felt plaintiff could manage her own funds. (Tr. 540).

### 6. RFC Assessment

A state agency consultant assessed plaintiff's mental RFC in January, 2011. She opined that plaintiff was moderately limited in some areas of functioning, including ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and perform at a constant pace without an unreasonable number and length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Additionally, the state agency consultant found plaintiff to be markedly limited in her ability to interact appropriately with the general public. (Tr. 561-62).

In her narrative remarks, the consultant said plaintiff retained the ability to understand, carry out, and remember moderately complex instructions. She felt plaintiff was capable of making work-related decisions and judgments. The consultant stated plaintiff would work best in a lowered stress environment, away from the general public. (Tr. 563).

## Analysis

Plaintiff argues that the ALJ incorrectly evaluated the medical opinion evidence in forming plaintiff's mental RFC and that the ALJ erred in his credibility determination. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

The ALJ is required to give "specific reasons" for his credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the

ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ gave multiple reasons and followed SSR 96-7's factors to form plaintiff's credibility determination. However, the reasons given by the ALJ for rejecting plaintiff's credibility are not supported by the record and are not valid.

The ALJ first looked at plaintiff's activities of daily living in forming his credibility assessment. The ALJ stated plaintiff was able to care for two dogs, drive a car, shop, maintain hygiene, prepare simple meals, and do household chores. He admitted this was not conclusive proof she could sustain full-time work but that it weighed against her credibility of her allegations. (Tr. 26).

The ALJ was correct in stating her activities do not necessarily indicate she could maintain full-time employment as the Seventh Circuit has criticized that assumption. See*, Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013), *Hughes v. Astrue,* 705 F.3d 276 (7th Cir. 2013), *Hamilton v. Colvin*. 525 Fed. Appx. 433**.** However, it is unclear how these limited activities undermine plaintiff's credibility. Plaintiff claimed to only get up out of bed a few times a day to let her dogs out. (Tr. 59). The record shows plaintiff normally only left her house once a week to attend therapy sessions and go to the grocery store with her daughter or friend. (Tr. 59-60, 252, 469). Plaintiff's therapists noted her hygiene became an issue when she was feeling depressed. (Tr. 467, 481, 497). Plaintiff did not have running water in her home so she only showered, cleaned her dishes, or did her laundry once a week when she left her home and could receive assistance. (Tr. 252, 458, 467). Plaintiff lived in her garage for a significant amount of time and her household chores were extremely limited. (Tr. 254, 453, 474, 496, 623). The ALJ does not explain how these limited activities undermine plaintiff's claims.

ALJ Stanley then looks to plaintiff's medical treatment history. He stated plaintiff's medical treatment was routine, conservative, and minimal in nature focusing primarily on medications. (Tr. 26). The ALJ also noted that most of plaintiff's treatment on record came from her primary care physician and that she was never treated by a dedicated psychiatrist. (Tr. 27).

Plaintiff points out that while the ALJ noted her regular therapy sessions earlier in his opinion, he ignored them in his credibility analysis. She states that her treatment for her psychiatric impairments does not reflect a focus primarily on medications. This Court agrees. Plaintiff's medical record consists primarily of medication alterations from her primary care physician in addition to treatment records from her psychiatric therapy sessions.

It is also important to note that medications play an extremely large role in treatment for psychiatric impairments like depression and bipolar disorder.[3] The Seventh Circuit has stated that bipolar disorder in particular "may require a complex drug regimen to deal with both the manic and depressive phases of the disease." *Kangail v. Barnhart*, 454 F. 3d 627, 630 (7th Cir. 2006). The focus on medications by plaintiff's primary care physician does not necessarily indicate conservative treatment, as that is one of the main ways to treat plaintiff's mental impairments.

The ALJ failed to acknowledge why plaintiff never received treatment from a "dedicated psychiatrist." Plaintiff was referred and recommended to see a psychiatrist multiple times. (Tr. 467, 469, 625). She was placed on a waiting list at Human Resources Center to receive treatment from a psychiatrist, but after she lashed out at the clinical director in a fit of anger she was removed from the list. (Tr. 469). Her need to see a psychiatrist did not diminish after she was

---

[3] *See*, http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/treatment/con-20027544 and http://www.nimh.nih.gov/health/topics/depression/index.shtml#part6 indicating medication and psychotherapy are the two most common treatments for depression and bipolar disorder.

removed from the waiting list, but she did not have adequate funds to seek treatment on her own. *Ibid.* The Seventh Circuit has stated that if an ALJ relies on a claimant's failure to seek treatment, he must question the claimant as to the reasons. *Virgil Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

The ALJ then takes issue with plaintiff's noncompliance in her treatment history. Plaintiff's missed therapy sessions and refusal to participate in group therapy sessions or engage in homework assignments damaged her credibility. (Tr. 27). An individual's statements may be seen as less credible if the individual is not following the treatment as prescribed and there are no good reasons for this failure. S.S.R. 96-7p. Here, the ALJ failed to look at the possible reasons for plaintiff's noncompliance.

Plaintiff correctly points out that the Seventh Circuit has stated that mental illnesses may prevent a claimant from seeking or submitting to appropriate treatment. *Kangail*, 464 F.3d 630. Plaintiff was repeatedly diagnosed with bipolar disorder, depression, histrionic disorder, posttraumatic stress disorder, and borderline personality disorder. (E.g., Tr. 467, 482, 498, 506, 539). The ALJ should have addressed the possibility that these disorders may have played a role in plaintiff's failure to follow her treatment plan or her missed therapy sessions.

Additionally, the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). This rule is long-standing. See, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), and cases cited therein. The ALJ needed to address the reasons for plaintiff's failure to receive treatment from a psychiatrist and her noncompliance.

The ALJ then states that plaintiff has a poor work history as she had not worked since 2005. He felt her motivation to work regardless of any alleged physical or psychological limitations should be questioned because she did not file her claim for four years. (Tr. 27). The ALJ's argument here lacks substance as it fails to take into consideration plaintiff initially filed for disability in 2005 but was rejected. (Tr. 138). Plaintiff had several jobs and the only potential gaps in work history occurred in 1986 and 1989. (Tr. 216). There is no evidence plaintiff was unmotivated to work, and the ALJ's assumption of this is error.

Finally, ALJ takes issue with plaintiff's failure to quit smoking. He states that "is the claimant's impairments were as severe and debilitating as she has alleged, then she would have done everything possible to stop smoking." (Tr. 27). This argument has little weight. The Seventh Circuit has held that a failure to quit smoking "is an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). They stated that it is "tenuous" to infer that a claimant is not credible because they do not quit smoking, in view of the addictive nature of cigarettes. *Ibid*.

In sum, none of the ALJ's reasons for his adverse credibility determination are sustainable, and therefore neither is the credibility determination. The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008). The ALJ's credibility analysis here lacks appropriate explanation and support. While ALJ Stanley considered appropriate factors, his usage and explanation of those factors failed to build the required logical bridge.

Plaintiff then argues that the ALJ erred in determining her mental RFC by failing to give her treating physician's opinion significant weight, not incorporating the RFC of Dr. Boyd in his opinion, and not considering the opinion of plaintiff's treating therapist.  A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). In other words, RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week, or an equivalent work schedule. Social Security Ruling 96-8P, 1996 WL 374184, at *2 (July 2, 1996) ("S.S.R. 96-8P"); *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In assessing a claimant's RFC, the ALJ must consider *all* of the evidence in the record, and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment. S.S.R. 96-8, at *5, 7.

First, the Court looks at the opinion of plaintiff's treating therapist. Both the Commissioner and plaintiff point out that plaintiff's therapist, Ms. Talbott, is not an "acceptable medical source" under the Commissioner's regulations. While the opinions of Ms. Talbott could not have been given controlling weight, plaintiff is correct in stating Ms. Talbott's opinions "should be evaluated on key issues such as impairment severity and functional effects." S.S.R. 06-03p. Here, the ALJ referenced Ms. Talbott's opinion briefly when he summarized plaintiff's medical history but did not mention her records again. (Tr. 23).

The Commissioner cites *Sullivan v. Astrue*, 825 F. Supp. 928 (N.D.Ill. 2011), in support of her argument that the ALJ did not need to discuss Ms. Talbott's opinion in any more detail. In the first place, Sullivan is a district court case and is therefore not precedential. *Harzewski v. Guidant Corporation*, 489 F.3d 799, 806 (7th Cir. 2007). Secondly, the ALJ in *Sullivan* addressed the therapist's opinion and gave it little weight as it was unsupported by other medical

16

evidence. Here, since no analysis of Ms. Talbott's opinions and diagnoses is on record, it seems as though the ALJ did not consider them in forming plaintiff's mental RFC.

The Commissioner points out that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." Here, Ms. Talbott was plaintiff's primary source for mental health treatment and her treatment notes make up a significant portion plaintiff's record. (Tr. 452-503, 793-795, 847-858). It seems apparent that the ALJ should have at least addressed Ms. Talbott's opinions in forming his mental RFC. As the court in *Sullivan* noted, "the adjudication generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 825 F. Supp. 940. The ALJ did not meet this standard.

Next, this Court looks at the weight given to plaintiff's treating physician, Dr. Pine-Mattas. "An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ is required to consider a number of factors in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." 20 C.F.R. §404.1527(c)(2) states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

Plaintiff argues that the ALJ failed to provide a "good reason" for giving Dr. Pine-Mattas's opinion limited weight. ALJ Stanley opined that there was no evidence that plaintiff could not perform simple tasks, avoid distraction, work at a consistent pace, maintain attention for two-hour segments, and that plaintiff would miss four days of work per month. The ALJ also stated plaintiff's "situational stressors" could be lessened or eliminated if plaintiff could maintain full-time employment. (Tr. 26).

ALJ Stanley's decision to give Dr. Pine-Mattas's opinion limited weight was insufficient. He makes the broad statement that no evidence supported Dr. Pine-Mattas's opinions, but as plaintiff points out the record does have evidence of most of these findings. Plaintiff's treatment records show she was inattentive, impulsive, distractible, and she had trouble functioning some days, (Tr. 454, 464-65, 469, 478-79). These records came from her therapist, however, and as noted above it is unclear how much weight the ALJ gave to her opinion. However, the ALJ did give Dr. Lanier's opinion great weight and she stated plaintiff would have moderate difficulty in concentration and being able to complete a normal workweek without interruptions from psychologically related symptoms. (Tr. 561-62). The consultative examiner felt plaintiff had reduced persistence and trouble with attention and concentration. (Tr. 538-40). While neither of these state agency doctors felt plaintiff was entirely disabled, their opinions provide some evidence that could support Dr. Pine-Mattas's opinions.

The Commissioner cites *Johnson v. Barnhart* where the Seventh Circuit established an ALJ was not required to give controlling weight to a treating physician when it was inconsistent with other substantial evidence on the record. 314 F.3d 283, 288 (7th Cir. 2002) However, the ALJ and the Commissioner fail to demonstrate where the significant evidence in contradiction to Dr. Pine-Mattas's opinion exists.

The Commissioner also cites two Seventh Circuit cases establishing it as reasonable for an opinion to be discounted when treatment records are not in support. However, in *Schaaf v. Astrue* the ALJ explicitly considered the treating physician's records and found they were not in support of his opinion. 602 F.3d 869 (7th Cir. 2010)(stating the doctor's notes that plaintiff's chronic fatigue and insomnia did not provide a sufficient medical basis for missing a week or more of work per month). In the second case, *Knight v. Chater*, the doctor's treatment notes were in direct opposition to his findings that plaintiff could not perform certain tasks. 55 F.3d 309 (7th Cir. 1995). Here, none of Dr. Pine-Mattas's opinions are in direct contradiction of her findings. On remand, the ALJ may or may not find plaintiff's treatment records provide the necessary clarification for Dr. Pine-Mattas's opinion. In either event, this determination is for the ALJ to make, rather than this Court.

The ALJ's statements concluding plaintiff's situational stressors could be lessened or eliminated if she maintained full-time employment were unavailing. To discount plaintiff's treating physician's opinion because plaintiff's symptoms could improve if she had a job is error. As plaintiff points out, it is illogical to think plaintiff could presently work a full-time job because her symptoms would improve if she was capable of sustaining full-time work.

Finally, plaintiff contends the ALJ did not incorporate the RFC of Dr. Boyd into his opinion. The ALJ is required by 20 CFR §§ 404.1527(f) and 416.927(f) to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. *Id.*

Here, Dr. Boyd stated plaintiff appeared "to have a reduced stress tolerance, emotional instability, and reduced persistence related to chronic pain, personality disorder, and depressive symptoms." (Tr. 25). The ALJ stated he gave Dr. Boyd's opinion great weight. However, he failed to state how this portion of Dr. Boyd's findings impacted his decision as he merely restated Dr. Boyd's opinion and moved on with his RFC determination. While Dr. Boyd's opinion does not necessarily find plaintiff disabled, it needs to be discussed in more detail when reviewing plaintiff's mental RFC. The Seventh Circuit has held that discounting the opinion of an examining physician requires good explanation, which ALJ Stanley failed to provide in the case at hand. *Beardlsey v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Lisa L. Ferree's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** 11/18/2014

                                           s/J. Phil Gilbert
                                           **J. PHIL GILBERT**
                                           **DISTRICT JUDGE**